In re GLEN IVY RESORTS, INC.
and related cases, Debtor.

FEDERAL INSURANCE
COMPANY, Movant,

v.

GLEN IVY MANAGEMENT COMPANY
and Thomas PL Williams, Chapter 7
Trustee, Respondents.

Bankruptcy No. SB92–16083MG.

United States Bankruptcy Court,
C.D. California,
San Bernardino Division.

Aug. 12, 1994.

As Amended Aug. 15, 1994.

Timothy J. Farris, Office of the U.S. Trustee, San Bernardino, CA.

M.D. Talbot, Speers, Dana, Teal, Balfour & MacDonald, Costa Mesa, CA.

Jeffrey W. Broker, Lobel, Winthrop & Broker, Irvine, CA.

Thomas P. Williams, Chapter 7 Trustee, c/o Glen Ivy Resorts, Inc., Corona, CA.

Norman L. Hanover, Hanover & Schnitzer, San Bernardino, CA.

John A. Belcher, Richards, Watson & Gershon, Los Angeles, CA.

H. Paul Breslin, Lawrence D. Hilton, Archer, McComas & Lageson, Walnut Creek, CA.

Jerry Phillips, Friedman & Phillips, Los Angeles, CA.

Gerald I. Neiter, Los Angeles, CA.

John Rapore, Rapore & Lowe, Santa Monica, CA.

Leonard Siegel, Wilner, Klein & Siegel, Beverly Hills, CA.

## MEMORANDUM OPINION AND ORDER

MITCHEL R. GOLDBERG, Bankruptcy Judge.

This dispute requires the court to decide if a bankruptcy trustee can subpoena an insurance company's claims files on the grounds that the claims files are relevant to determining the nature and extent of property of the estate. The court's decision discusses the issue of the ability of the trustee, under Bankruptcy Court jurisdiction, to subpoena insurance company claims files in an attempt to determine what may or may not be an asset of the estate. It does not decide whether the claims files are discoverable through litigation in another forum.

### FACTS

Glen Ivy Resorts and twelve related entities were engaged in the business of develop-

ing and marketing timeshare resorts at several locations in California and many other states. Approximately 67,000 individuals purchased timeshare intervals [1] from the Glen Ivy entities from January 1987 to September 1991. Most purchasers signed a purchase contract to finance the purchase price, and in exchange were to receive a deed to the timeshare interval.

Allegedly, Glen Ivy oversold intervals at various locations, sold timeshare units at locations they did not own, and made certain representations about exchange rights at other timeshare resort locations. Therefore, it has been alleged that a substantial number of purchasers did not receive good title to their timeshare interval, and did not receive all the benefits promised by Glen Ivy.

Based on the above allegations, the purchasers commenced three separate class action lawsuits [2] against the Glen Ivy entities, their officers and directors and other parties who participated in the timeshare sales transactions. In addition, the alleged over-

selling was the subject of an investigation by the California Attorney General.

Shortly thereafter, Glen Ivy Resorts, Inc. and the other related entities filed Chapter 7. Pursuant to the court's order, these cases have been substantively consolidated. Thomas P. Williams was appointed Chapter 7 trustee of the various debtor entities and has been authorized to operate the debtor's business.

■ Federal Insurance Company is one of seventeen carriers involved in this case. Federal issued twelve policies to timeshare interval owners associations. Although a dispute exists between the parties as to the exact date, it is undisputed by the carrier that the Trustee tendered the defense of Glen Ivy Management Co. in connection with the timeshare purchaser class action lawsuits to Federal on or before October 6, 1993.[3]

In an attempt to identify insurance policies which might be available to satisfy the timeshare purchaser's claims, the Trustee served a subpoena on Federal on October 21, 1993.[4]

---

1. A timeshare interval is an estate representing a fee simple of leasehold interest in real property of a timeshare resort, together with all the ancillary rights and obligations associated therewith.

2. *Heiman v. Glen Ivy Holdings, Inc., et al.,* BC044657, was commenced December 18, 1991 in the Los Angles County Superior Court. The *Heiman* action, named Glen Ivy and several title insurance companies as defendants. It alleged false advertising, filing false public reports, fraud, negligence, breach of contract to convey real property and breach of contract of title insurance.
   *Turabaz v. Glen Ivy Resorts, Inc., et al.,* BC045452, was commenced February 10, 1992 in the Los Angeles County Superior Court. The *Turabaz* action named several Glen Ivy entities, officers and directors, and title insurance companies. The complaint alleged fraudulent practices in the issuance of securities, unfair business practices, fraud, negligent misrepresentation, breach of fiduciary duty and negligence.
   *Kester v. Chemical Bank, N.A., et al.,* BC074167, was commenced February 4, 1993 in the Los Angeles County Superior Court. The *Kester* action alleged that several of the banks and institutional lenders who financed Glen Ivy's timeshare sales conspired with and aided and abetted the debtor in carrying out its fraudulent sales schemes.

3. Under California Law, an insurance carrier has a duty to defend its insured against lawsuits which allege claims which are or could potential-

ly be covered by the insurance policy. *See generally Horace Mann Ins. Co. v. Barbara B.,* 4 Cal. 4th 1076, 1083, 17 Cal.Rptr.2d 210, 846 P.2d 792 (1993).

4. The documents included:
   I. Copies of 35 specific insurance policies identified by policy number;
   II. All documents, including but not limited to underwriting files, correspondence and claims files, related to those 35 policies;
   III. Copies of all policies issued to 127 named entities, including Glen Ivy Management Co. and other debtor entities;
   IV. All documents, including but not limited to underwriting files, correspondence and claims files, related to those policies;
   V. All documents related to the actions styled *Abdul Turabaz, et al. v. Ralph Mann, et al.,* LASC Case No. BC 045452 (*"Turabaz"*) and *Lee C. Heiman, et al. v. Ralph Mann, et al.,* LASC Case No. BC 044657 (*"Heiman"*);
   VI. All policies of insurance naming 12 specific individuals as named or additional insureds;
   VII. All documents, including but not limited to underwriting files, correspondence and claims files, relating to policies issued in which those individuals are named or are additional insureds.

The subpoena demanded production of numerous insurance policies and various documents relating to those policies. In addition, the subpoena demanded production of the carrier's claims files connected with the *Heiman* and *Turabaz* class action lawsuits.[5]

Federal brought an ex-parte Motion to Quash the subpoena. At a hearing held October 26, 1993, the motion was granted in part. The order, subsequently entered December 27, 1993, required Federal to make certain policies available to the Trustee, and to provide a list of policies in effect during and after 1987. With respect to the *Heiman* and *Turabaz* claims files, Federal was given four options. It could produce the documents; accept the tender of defense; seek relief from stay to bring a declaratory relief action in state court; or commence an adversary proceeding in the bankruptcy court to determine the coverage issue.

On November 23, 1993, Federal declined to accept the defense of Glen Ivy Management Co. claiming Glen Ivy was not an insured under any Federal policy.[6] Accordingly, it chose not to exercise the first two options, instead electing to seek relief from stay. Although this court could have exercised "noncore" related jurisdiction in the matter, I granted relief from stay on March 21, 1994 in order to let either Federal or the Trustee commence a declaratory relief action in state court to determine if Glen Ivy Management Co. was an insured under the policies and resolve Federal's coverage obligation to Glen Ivy Management Co.[7]

By abstaining and granting relief from stay, the coverage issue was removed from this court's jurisdiction.[8] This foreclosed the Trustee from compelling production of the claims files insofar as the theory behind the production was their relevance to the coverage dispute. However, relying on the Ninth Circuit opinion of *John Hancock Mut. Life Ins. Co. v. Watson (In re Kincaid)*, 917 F.2d 1162 (9th Cir.1990), the trustee continues to assert that it may compel production of the claims files on the theory that the discovery is relevant to "determining the nature and extent of estate assets", which *Kincaid* defines as a core matter. This opinion resolves the issue of a Bankruptcy Court's power to compel production of insurance company claims files under the theory articulated in *Kincaid*.

## APPLICABLE LAW

Production of Documents is governed by FED.R.BANKR.P. 7034 which incorporates in full FED.R.CIV.P. 34: FED.R.CIV.P. 34(a) permits a party to discover documents so long as the document is within the scope of Rule 26(b). FED.R.CIV.P. 26(b) limits discovery to "any matter, not privileged, which is relevant to the *subject matter* involved in the pending action ... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."[9] [emphasis supplied].

---

5. Federal maintains claims files in the *Heiman* and *Turabaz* actions because Federal has been defending several Glen Ivy *officers* and *directors* since March 1992 pursuant to 11 of the 12 policies.

6. The Trustee claims Glen Ivy Management Co. is an insured and Federal's declination of coverage was wrongful.

7. Federal argues that because coverage questions are noncore matters, the bankruptcy court has *no* jurisdiction to hear this dispute. Although the court agrees that declaratory relief actions to determine coverage are non-core matters, Federal is wrong to conclude that the bankruptcy court is *per se* without jurisdiction to hear them. Such coverage disputes—especially in a case as complex as this one—fall within the bankruptcy court's related jurisdiction. *National Union Fire Ins. Co. v. Titan Energy, Inc. (In re Titan Energy, Inc.)*, 837 F.2d 325 (8th Cir.1988). Nonetheless,

the point is irrelevant because there is no coverage action pending in this court.

8. 28 U.S.C. § 1334(c)(1).

9. Federal Insurance Company does not assert that the claims files are privileged. It argued they are immunized from discovery pursuant to old Fed.R.Civ.P. 26(b)(2); 28 U.S.C. (1993). Prior to the 1994 amendments, that rule limited discovery to

"the existence and contents of any insurance agreement under which any person, carrying on an insurance business may be liable to satisfy all or part of a judgement which may be entered in the action.... For purposes of this paragraph, an application for insurance shall not be treated as part of an insurance agreement."

Rule 26 was amended in 1970 to permit discovery of insurance. The advisory comments ex-

As Rule 26 indicates, a court's discovery powers are co-terminus with its subject matter jurisdiction. Therefore, in order to compel production of the claims files, the trustee must show that the contents of the claims files either are or will lead to the discovery of evidence relevant to an issue within the scope of the bankruptcy court's subject matter jurisdiction.

Jurisdiction to hear bankruptcy cases is established by 28 U.S.C. § 1334.[10] The original jurisdiction granted to district courts has been referred to bankruptcy courts pursuant to 28 U.S.C. § 157. Bankruptcy court jurisdiction extends to proceedings "arising in" or "arising under" title 11. 28 U.S.C. § 157. Bankruptcy courts are empowered to enter final orders in "core" matters, but, absent consent of the parties, may only recommend findings of fact and conclusions of law to the district court in "non-core" matters.[11] See

*Duck v. Munn (In re Mankin)*, 823 F.2d 1296, 1301–06 (9th Cir.1987).

28 U.S.C. § 157(b)(2) contains a non-exclusive laundry list of what matters constitute core proceedings.[12] Notwithstanding the grant of relief from stay and the court's decision to not exercise jurisdiction over the coverage issue,[13] the trustee asserts that production of the claims files remains within the court's core jurisdiction under 28 U.S.C. § 157(b)(2)(A) by virtue of how that provision has been interpreted in *John Hancock Mut. Life Ins. Co. v. Watson (In re Kincaid)*, 917 F.2d 1162 (9th Cir.1990).

*Kincaid* involved a turnover action brought by the chapter 7 trustee against the plan administrator of a 401(k) plan to which the debtor had contributed funds. The plan administrator contested bankruptcy court jurisdiction on the ground that ERISA[14] preempted the trustee's turnover action. In affirming the bankruptcy court and BAP

---

plain that prior law prevented discovery of insurance because the evidence was not admissible at trial and such discovery would intrude on the privacy of the insured. While the rule carves out an exception for the application for insurance, the purpose for this is to protect the applicant's privacy. Nowhere in the comments does the committee suggest that claims files are not discoverable when coverage is the focus of the dispute.

**10.** 28 U.S.C. § 1334 provides in relevant part:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
(b) Notwithstanding any act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

**11.** 28 U.S.C. § 157(c)(1) provides:

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district judge, and any final order or judgement shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

**12.** 28 U.S.C. § 157 provides in relevant part:

(b)(2) Code proceedings include, but are not limited to—
(A) Matters concerning administration of the estate;
(B) Allowance or disallowance of claims against the estate or exemptions from property of the estate ...;
(C) Counterclaims by the estate against persons filing claims against the estate;
(D) Orders in respect to obtaining credit;
(E) Orders to turn over property of the estate;
(F) Proceedings to determine, avoid, or recover preferences;
(G) Motions to terminate, annul, or modify the automatic stay;
(H) Proceedings to determine, avoid, or recover fraudulent conveyances;
(I) Determinations as to the dischargeability of particular debts;
(J) Objections to discharges;
(K) Determinations of the validity, extent, or priority of liens;
(L) Confirmation of plans;
(M) Orders approving the use or lease of property ...;
(N) Orders approving the sale of property ...;
(O) Other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or equity security holder relationship....

**13.** 28 U.S.C. § 1334(c)(1).

**14.** *See* 29 U.S.C. § 1132(e)(1).

opinions, the 9th Circuit held that 29 U.S.C. § 1144(d) expressly prohibited ERISA from preempting federal law. Because "core" proceedings are exclusively governed by federal bankruptcy law, the turnover action would not be preempted if it was a core matter. *Id.* at 1164.

The 9th circuit held the trustee's action to be a core matter because

> "determining the nature and extent of property of the estate is also a fundamental function of a bankruptcy court ... [and] fundamental to the administration of a bankruptcy case." *In re Kincaid*, 96 B.R. 1014, 1017 (9th Cir. BAP 1989). Since an action to obtain property of the estate would necessarily involve a determination regarding "the nature and extent of property of the estate," the action would also be a matter "concerning the administration of the estate," and, therefore, a core proceeding. 28 U.S.C. § 157(b)(2)(A).

*Id.*, 917 F.2d at 1165.[15]

The trustee contends that the claims files are relevant to prove that Glen Ivy Management Company is an insured under the twelve Federal Insurance Co. policies, and therefore its discovery request is a proceeding to determine the nature and extent of estate assets. The key questions this court must decide are: How broad is *Kincaid's* definition of core jurisdiction under § 157(b)(2)(A); and Does the Trustee's discovery request relate to a matter within the scope of *Kincaid.*

### ANALYSIS

Because subject matter jurisdiction is a limitation on a court's power to hear and enter final judgments in a dispute, *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982), this court must be mindful of the limitations placed on its power by virtue of how its jurisdiction has been defined by Congress. The core/noncore distinction is rooted in a non-debtor party's right to have an Article III court decide any dispute regarding its legal obligations.[16] Ordinarily, Federal judicial power must be exercised by an Article III court, however because U.S. CONST., art. 1, § 8, cl. 4, vests the power to "establish ... uniform Laws on the subject of Bankruptcies throughout the United States" in Congress, Congress may prescribe the manner in which disputes under title 11 are determined. *Id.*, 823 F.2d at 1308. Because the adjustment of debtor/creditor relationships is the historical function of bankruptcy laws, the Bankruptcy Court has the power to make final determinations in this arena. *See Northern Pipeline Constr. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (state law contract claim must be determined by an Article III court); *Mankin*, 823 F.2d at 1307 (trustee's fraudulent conveyance action brought pursuant to state law is a core matter notwithstanding its origin in state law because it is within Congresses discretion to utilize the state law rule of decision in implementing the bankruptcy laws).

Thus, the distinction between core and non-core proceedings depends on the nature of the right being adjudicated and the purpose for which the adjudication is being made. Disputes which have their origin under non-bankruptcy law and which do not relate to the adjustment of debtor creditor relationships are non-core matters over which the Bankruptcy Court may only act as an adjunct to the district court.

On its face, the quoted language from *Kincaid* could be interpreted to mean that "matters affecting the administration of the estate" includes litigation commenced by the

---

**15.** Subsequent 9th Circuit cases have relied on the quoted language in *Kincaid* to decide if a proceeding is core because it "arises in" or "arises under" title 11, even though the proceeding is not one expressly included in 28 U.S.C. § 157(b)(2)'s list of core matters. *Johnston Environmental Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 616–17 (9th Cir.1993).

**16.** U.S. CONST. art. III, § 1 provides:

> The judicial Power of the United States, shall be vested in one supreme court, and in such inferior courts as the Congress may, from time to time ordain and establish. The Judges, both of the Supreme Court and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Trustee to establish the estate's rights to property or against third parties. However, numerous 9th Circuit cases decided both before and after *Kincaid* have placed proceedings which determine a non-debtor party's legal obligations (other than obligations arising out of debts) to the debtor estate outside the scope of the bankruptcy court's core jurisdiction. *See Robertson v. Isomedix, Inc. (In re Intl Nutronics, Inc.)*, 3 F.3d 306, 310–11 (9th Cir.1993) (debtor's anti-trust claims are non-core matters because Sherman Act claims do not arise under title 11 and "the outcome of the Trustee's cause of action will not affect any parties' rights under the administration of the estate"); *Kaonohi Ohana, Ltd. v. Sutherland (In re Kaonohi Ohana, Ltd.)*, 873 F.2d 1302, 1306–07 (9th Cir.1989) (creditor's action for specific performance is a core matter because resolution of that action will alter potential obligations arising out of claims pending against the estate.).

The 9th Circuit has repeatedly held that the "catch-all" provisions of § 157(b) cannot be interpreted so broadly that they blur the distinction between "core" and "non-core related" proceedings. To do so would render meaningless the constitutionally mandated distinction between the bankruptcy court's core and non-core jurisdiction. *Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159, 162 (9th Cir. 1986); *See also Taxel v. Electronic Sports Research (In re Cinematronics, Inc.)*, 916 F.2d 1444, 1450 (9th Cir.1990) (reversing bankruptcy court's finding core jurisdiction existed under 28 U.S.C. § 157(b)(2)(A) because the action would not "directly determine or adjust the relationship of the Cinematronics estate to its creditors.")

In light of these Ninth Circuit pronouncements on what constitutes core and non-core matters, and the clear mandate to respect the difference between the two, this court is constrained to interpret *Kincaid* in a manner consistent with the law of this Circuit.[17] The dispute in *Kincaid* involved who—trustee or plan administrator—had a *present possessory interest* in the 401k funds. *Kincaid*, 917

F.2d at 1165. It was NOT a dispute over the amount of contributions to the plan, breach of the plan administrator's duties to the debtor, or even the debtor's title to the asset.

■ The proceeding brought in *Kincaid* did not *fix* the non-debtor party's legal obligations to the debtor or the debtor's assets, which is precisely the kind of dispute which must be decided by an Article III court. *See Mankin*, 823 F.2d at 1301–02. Therefore, this court reads *Kincaid* to hold that "determining the nature and extent" of estate assets does not embrace litigation commenced by the trustee to determine the estate's interest in property or rights against a non-debtor third party. Accordingly, the trustee could only compel discovery under the principals of *Kincaid* if the information contained in the claims files will show, without a judicial determination of Federal's obligations to the debtor to provide coverage, that Glen Ivy Management Co. in an insured under the Federal policies.

The trustee seems to characterize this discovery request as one aimed at determining the *existence* of an estate asset in the same way that discovery of bank account records would show the existence of funds on deposit in a bank to which the estate had a claim. However, the trustee's own arguments for the relevance of the claims files to the determination of insured status belie such a characterization.

The trustee advances three theories upon which Glen Ivy Management Company is an insured. First, Glen Ivy Management is an insured because by failing to timely raise "non-insured" status as a ground to deny coverage, Federal waived that defense to coverage. Second, Glen Ivy Management Company detrimentally relied on Federal's silence in the thirteen months since the tender, thereby estopping Federal from denying coverage. Third, Federal's thirteen month delay in responding to the tender of defense

---

**17.** It is worth noting that *Kincaid* cited *Marathon* but did not discuss *Castlerock* or *Cinematronics*. *Kincaid*, 917 F.2d at 1165. We infer from this that *Kincaid* did not perceive its inclusion of

matters "determining the nature and extent" of estate property either expanded or created an inconsistency with existing Ninth Circuit law defining the Bankruptcy Court's core jurisdiction.

breach of its duty to defend and therefore, a duty to cover arises by operation of law.[18]

Each of the legal theories the trustee seeks to pursue requires a judicial determination of Federal's legal obligations to the debtor estate arising under the insurance contracts or by operation of law. If successful, the trustee's action could bring an asset into the estate (insurance coverage). However, that alone is not a sufficient basis upon which to make the matter core. To hold otherwise would make any sort of litigation by the estate against a third party a core proceeding under § 157(b)(2)(A) as it is inconceivable for the trustee to initiate litigation in the bankruptcy case for which the ultimate goal is not to recover assets for the estate. Such an expansion of § 157(b)(2)(A) would make a mockery of the core/non-core distinction.

## CONCLUSION

§ 157(b)(2)(A)'s reference to "matters affecting administration of the estate" cannot be interpreted to include disputes that will fix a non-debtor third party's legal obligations to the estate when the dispute does not grow out of a direct adjustment of debtor/creditor relationships. Therefore, the court holds that *Kincaid's* inclusion of proceedings "to determine the nature and extent of estate assets" within the bankruptcy court's core jurisdiction is limited to disputes regarding the *existence of* and the estate's *present possessory interest in* assets of a debtor or the estate.

The trustee's reliance on *Kincaid* essentially seeks to put the "cart before the horse." The trustee's right of discovery, if any, will only be pursuant to an action for a judicial determination of Federal's obligations either under its policies or because of other alleged misconduct. This coverage action falls with the court's "related to" jurisdiction, and this court has already granted relief from stay so that the coverage action can be brought in state court. Therefore,

the trustee may not seek production of the claim files through the Bankruptcy Court.

## *ORDER*

In accordance with the foregoing, it is hereby ORDERED, that Federal Insurance Company's Motion to Quash the Subpoena of the Heiman and Turabaz claims files is granted.

---

**18.** During oral argument, counsel for the trustee made the additional argument that this proceeding concerned a "matter affecting the administration of the estate" because Federal's letter denying coverage reserved the right to assert additional grounds to deny coverage. Because the estate risked the "surprise" of new defenses to coverage at a later time, it was entitled to know in advance what those might be because the estate would be forced to deplete its assets in addressing these new defenses to coverage.